UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

SAMARITAN HEALTH CENTER,

          Plaintiff,

        v.                                Case No. 02-C-0387

THE SIMPLICITY HEALTH CARE PLAN,
SIMPLICITY MANUFACTURING, INC.,
FIRST HEALTH BENEFITS ADMINISTRATORS
CORP.,

          Defendants.

## BENCH TRIAL DECISION

        As discussed more fully below, this case involves Samaritan's claim for benefits on behalf of Mary Ann Bowe, under the Simplicity Health Care Plan.  Trial to the court was bifurcated, such that a victory for Samaritan in this first phase will generate a second bench trial between the two Simplicity defendants and First Health Benefits Administrators Corp. on the Simplicity defendants' cross-claim.

        It is undisputed that the court has jurisdiction over this case under the Employee Retirement Income Security Act of 1974 (ERISA).  *See* 29 U.S.C. §1132(a)(1)(B).

### I.  STIPULATED FACTS

        In their joint final pretrial report, the parties stipulated to the following facts, which are necessary for discussion of two preliminary legal matters as well as the merits of Samaritan's claim.

This lawsuit arises from denial of claims for benefits under a self-insured health benefits plan, the Simplicity Health Care Plan (Plan), sponsored and administered by Simplicity Manufacturing, Inc. (Simplicity). (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 1.)

Simplicity established the Plan – a self-funded welfare benefit plan subject to ERISA – which provided medical benefits as well as prescription drug, dental, vision, and sickness and accident benefits. (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 2; Tr. Ex. 1 at 72.) Simplicity was the named "Plan Sponsor" and "Plan Administrator" in the "Medical Plan Document" dated January 1, 1994. (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 3; Tr. Ex. 1 at 64.) The Medical Plan Document defined the term "Plan Administrator" as follows:

> Simplicity Manufacturing, Inc. is the named fiduciary of the plan, and is the Plan Administrator with the authority to control and manage the operation and administration of the plan. The Plan Administrator will have full power to administer the Plan in all of its details, subject to applicable requirements of law. For this purpose, the Plan Administrator's powers will include, but will not be limited to, the following authority, in addition to all other powers provided by this Plan:
>
> (a) To make and enforce such rules and regulations as it deems necessary or proper for the efficient administration of the Plan, including the establishment of any claims procedures that may be required by applicable provisions of law;
>
> (b) To interpret the Plan, its interpretation thereof in good faith to be final and conclusive on all persons claiming benefits under the Plan;
>
> (c) To decide, within its discretion, all questions concerning the Plan and the eligibility of any person to participate in the Plan;

(d)     To appoint such agents . . . and other persons as may be required to assist in administering the Plan; and

(e)     To allocate and delegate its responsibilities under the Plan and to designate other persons to carry out any of its responsibilities under the Plan, any such allocation, delegation or designation to be in writing.

(Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 5; Tr. Ex. 1 at 64.)

Simplicity self-administered the Plan and "engaged the services of certain organizations to provide claims administration services." (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 6; Tr. Ex. 1 at 72.) First Health was a named third-party claims administrator under the Plan. (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 7; Tr. Ex. 1 at 72.) The Medical Plan Document stated that "sickness & accident benefits are adjudicated by First Health. The medical benefits are adjudicated by First Health, in conjunction with Associates for Health Care. . . ." (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 8; Tr. Ex. 1 at 72.) The Medical Plan Document defined "Claims Administrator" as follows:

The *claims administrator* for the plan is First Health Strategies, Inc., the organization retained by the *plan administrator* to provide claims administration services to the plan. Although claims determinations will routinely be performed by the *claims administrator*, the *plan administrator* retains ultimate authority to interpret plan terms and make determinations regarding eligibility and benefits.

(Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 9; Tr. Ex. 1 at 57.)

The Medical Plan Document set forth for plan participants the process by which disputed claims could be appealed. The plan participant could "file an appeal within 60 days of receipt of the denial notice." (Tr. Ex. 1 at 49.) An appellant was to mail the request for

3

review of a benefits denial to First Health in Kentucky. (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 10; Tr. Ex. 1 at 50.)

First Health and Simplicity entered an administrative services agreement captioned "Master Services Agreement" (the MSA), effective from January 1, 1996, to December 31, 1999. (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 11.) The MSA provided that First Health was to perform its services "in accordance with the terms of the Plan and within the framework of directives, policies, interpretations, rules, practices and procedures made by [Simplicity], to the extent that such are consistent with the Exhibit(s) [to the MSA] and all applicable laws and regulations." (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 12; Tr. Ex. 15 MSA 1996 ¶ 1.) It stated further:

> 3. AUTHORITY OF FIRST HEALTH. FIRST HEALTH is engaged to perform the services under this Agreement as an independent contractor and not as a fiduciary of the Plan or as an employee or agent of [Simplicity]. FIRST HEALTH shall have no final discretionary authority or control over the management or disposition of Plan assets, and no authority over or responsibilities for Plan administration. Because FIRST HEALTH is neither the Plan Sponsor or Administrator, nor a provider of health care services to Plan participants or beneficiaries (collectively "claimants"), FIRST HEALTH shall have no responsibility for: (a) any funding of Plan benefits; (b) any insurance coverage relating to the Plan, claimants, or Client; or (c) the nature or quality of professional health services rendered to claimants.

(Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 13; Tr. Ex. 15 MSA 1996 ¶ 3.)

The MSA's Services and Fees Exhibit provided that First Health was to conduct the claims review and appeals procedures "in accordance with Plan provisions" and that First

4

Health was to advise the plan administrator, i.e., Simplicity, of all appeals of denied claims for the plan administrator to make the final benefits determinations. (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 14; Tr. Ex. 15 Services & Fees Ex. ¶ II.B.7.)

The Medical Plan Document set forth specific coverage criteria that must be satisfied for services or supplies to qualify as "benefits" to which the participant was entitled. Among other requirements, services and supplies were required to be "medically necessary" for the treatment of a covered illness or injury. (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 15; Tr. Ex. 1 at 25.) "Medically necessary" was defined in the Medical Plan Document as:

> Treatment, services or supplies are *medically necessary*, if as determined by the plan administrator, based on recommendations of the claims administrator, all of the following are true: (1) they are generally accepted by the national professional medical community as being safe and effective in treating a covered *illness or injury*; and (2) they are consistent with the symptoms or diagnoses; and (3) they are furnished at the most appropriate medical level; and (4) they are not primarily for the convenience of the patient, a *health care provider*, or anyone else; and (5) they are not *experimental/investigative (investigational)*.
>
> Because a *health care provider* has prescribed, ordered or recommended a service or supply does not, in itself, mean that it is *medically necessary* as defined above.

(Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 16; Tr. Ex. 1 at 62.)

"Skilled Nursing Facility" was defined as a

> public or private facility, licensed and operated according to the law, which provides: permanent and full-time facilities for 10 or more resident patients; a registered nurse or physician on full-time duty in charge of patient care; at least one registered nurse or licensed practical nurse on duty at all times; a daily medical

5

> record for each patient; transfer arrangements with a hospital;
> and a utilization review plan.

(Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 17; Tr. Ex. 1 at 66.) Moreover, "[t]he facility must be primarily engaged in providing continuous skilled nursing care for persons during the convalescent stage of their *illness* or *injury*, and is not, other than by coincidence, a rest home for *custodial care* or for the aged." (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 17; Tr. Ex. 1 at 66.)

The plan excluded from coverage "custodial care," which was defined as "services and supplies that are furnished primarily to assist an individual in the activities of daily living," for example, "bathing, feeding, administration of oral medicines, or other services that can be provided by persons without the training of a *health care provider*." (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 18; Tr. Ex. 1 at 26.)

Mary Ann Bowe's entitlement to benefits is defined in the Medical Plan Document, which is Exhibit 1 to the Complaint and Trial Exhibit 1. (Joint Final Pretrial Report Stip. 6.) Bowe's medical condition was such that she was entitled to the benefits provided by the Plan for her treatment by Samaritan Health Center from October to some point during November 1995. (Joint Final Pretrial Report Stip. 2.)

Pursuant to an assignment of benefits, Samaritan submitted claims to First Health, as third-party administrator, for health care services rendered after November 11, 1995. (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 21.) Samaritan, on Bowe's behalf, submitted claims for health care services for a period of time subsequent to November 11, 1995, which were denied. (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 22.)

6

On September 24, 1996, Samaritan sent a letter to the claims review committee of First Health requesting reconsideration of the denial and payment of charges incurred from March through August 1996. (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 23.) On December 12, 1996, First Health upheld the original denial of claims on the ground that skilled nursing care was not medically necessary. First Health observed that the "patient is not medically unstable and does not require 24 hour per day nursing evaluation/care. She could be managed with a home health nurse administering the insulin shots. The patient does not meet our definition of requirements for skilled nursing placement." (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 24; Tr. Ex. 4.)

On February 11, 1997, Samaritan further appealed the claims denial. (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 25; Tr. Ex. 5.) On April 28, 1997, First Health responded to the appeal and upheld the claim denial. First Health stated:

> We have determined, through a comprehensive second-level professional medical review, that this case does not meet plan criteria for reimbursement. . . . Without question, this patient has many medical problems. However, neither her noncompliance nor her polypharmacy needs would justify SNF [skilled nursing facility]. This case qualifies as custodial care, and as such is not covered under the terms of this plan.

(Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 26; Tr. Ex. 6.)

The parties acknowledged in the MSA that Simplicity, not First Health, had final discretionary authority to determine what benefits would be paid by the Plan. (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 27; Tr. Ex. 15 MSA ¶ 5.)

Simplicity's expert witness, Dr. Bruce Herman, has opined that Bowe required "skilled nursing care" only from October 27, 1995, through November 7, 1995, and that skilled nursing care was not medically necessary thereafter. (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶¶ 31-32.)

Samaritan is the proper assignee of Bowe's claim for benefits and is entitled to whatever payment the court awards in this matter. (Joint Final Pretrial Report Stip. 4.) As the assignee of welfare benefits under the Plan, Samaritan properly exhausted its remedies in the administrative appeal process. (Joint Final Pretrial Report Stip. 5.)

When it acted as the third party administrator of the Plan, defendant First Health was called First Health Group Corp., and used a subsidiary, First Health Strategies (TPA), Inc. for claims adjudication. Subsequently, the company was purchased, its claims appeals operation was moved from Kentucky to California, and it became First Health Benefits Administrators Corp. First Health ceased all contractual relationships with Simplicity and the Plan as of January 1, 1999. (Joint Final Pretrial Report Stip. 8.)

Mary Ann Bowe died on March 11, 2002. (Joint Final Pretrial Report Stip. 7.) And, if Samaritan prevails in this action, it is entitled to damages in the amount of $63,496.75, exclusive of any interest. (Joint Final Pretrial Report Stip. 9.)

## II.  REJECTION OF LACHES ARGUMENT

As an initial matter, the court must address Simplicity's laches argument. If persuasive, no factual findings regarding the merits of the case will be necessary.

For laches to apply as a bar to Samaritan's claim, Simplicity must demonstrate: (1) an unreasonable or inexcusable delay or lack of diligence by Samaritan, and (2) prejudice resulting from that delay or lack of diligence. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813,

820 (7th Cir. 1999); *Winchester v. Pension Comm. of Michael Reese Health Plan, Inc. Pension Plan*, 942 F.2d 1190, 1194 (7th Cir. 1991). Prejudice for laches purposes comes "from the loss of evidence which diminishes the defendant's chance of success at trial." *Winchester*, 942 F.2d at 1194. It occurs "when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed" or when "the plaintiff's unexcused failure to exercise its rights caused the defendant to rely to its detriment." *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 795 (7th Cir. 2002). The amounts of delay and prejudice required for a finding of laches vary based on the amount of one versus the other – where a short period of time has elapsed since accrual of the claim the amount of prejudice required is great, whereas a lengthy delay means less prejudice is required. *Id.*; *Hot Wax, Inc.*, 191 F.3d at 824.

An ERISA benefits cause of action accrues when the claim for benefits is finally denied, such as a denial after appeal. *Daill v. Sheet Metal Workers' Local 73 Pension Fund*, 100 F.3d 62, 65-66 (7th Cir. 1996). ERISA does not contain a statute of limitations, so the court borrows the most appropriate state statute of limitations. *Daill*, 100 F.3d at 65; *Jenkins v. Local 705 Int'l Bhd. of Teamsters Pension Plan*, 713 F.2d 247, 251 (7th Cir. 1983). Here, the parties appear to agree that the limitations period is no less than six years, and Samaritan filed this case within that period. Nevertheless, the doctrine of laches may apply even before the statute of limitations expires, as it is a doctrine of estoppel rather than a substitute for the statute of limitations. *Maksym v. Loesch*, 937 F.2d 1237, 1248 (7th Cir. 1991). However, in cases where a federal statute does not contain an express statute of limitations and instead borrows from state statutes, the analogous state limitations period serves as a baseline for a presumption of laches; this baseline principle presumes that an action is *not* barred if

brought within the state limitations period. *Hot Wax, Inc.*, 191 F.3d at 821-22; *see Chattanoga Mfg., Inc.*, 301 F.3d at 793.

As indicated above, First Health rejected Samaritan's appeal of Bowe's claim on April 28, 1997. Samaritan then waited until April 17, 2002, to file this case. In the meantime, Bowe died; First Health was purchased and moved its claims appeals operation from Kentucky to California, and Simplicity and First Health broke off their relationship under the MSA; and First Health was removed as claims administrator for the Plan. Moreover, Simplicity contends that by the time this lawsuit was filed the documents relating to Bowe's and Samaritan's claim could no longer be found.

Because Samaritan filed the case within the statute of limitations period, the claim is presumed to be timely. But in response to Simplicity's laches argument, Samaritan presents no reason at all for the five-year delay between the denial of the claim and the filing of this case. If there is *no* reason there can be no *good* reason for the delay.

Nevertheless, Simplicity has not shown prejudice related to any unreasonable delay. Bowe's death has not harmed Simplicity, as her medical records and testimony of her doctors are available. And any harm to Simplicity based on a lack of records is not related to Samaritan's delay but rather to Simplicity's and First Health's contractual relationship. Further the MSA provided that all information reasonably required by First Health to render its services (the "Plan Records") remained the property of Simplicity but was to be maintained by First Health. (Tr. Ex. 15 MSA ¶ 8.) Further still, upon Simplicity's termination of the MSA, First Health was to

> deliver to [Simplicity] or its designee as soon as reasonably possible those Plan Records in FIRST HEALTH's possession. The Plan Records may be delivered in the format in which they

10

are maintained by FIRST HEALTH, but shall include sufficient format explanations and documentation to enable the recipient to have immediate use of the record information. . . . FIRST HEALTH shall maintain all Plan Records in its possession for seven years, or until they have been transferred to [Simplicity] or its designee, whichever occurs first.

(*Id.*)

First Health was to retain documents for seven years or until transfer to Simplicity. First Health's claims administration services terminated in 1999, just two years after Samaritan's claim accrued, so First Health should have had Bowe's records and claim information in its possession at that time. Thus, Simplicity should have received all documentation relating to Bowe's and Samaritan's claim from First Health following termination of the MSA. If documentation was lost in the transfer at that time or when First Health was purchased and moved to California (assuming that occurred before termination of the MSA), the loss was not related to Samaritan's delay, which at that time was only two years, but rather to Simplicity's and First Health's actions.

The court sees no change of position on the part of Simplicity that would not have occurred if the plaintiff had not delayed, nor did Samaritan's failure to sue cause Simplicity to rely to its detriment in any way. Therefore, Simplicity's laches argument is rejected.

### III. DE NOVO STANDARD OF REVIEW

ERISA permits a beneficiary to sue to recover benefits due, enforce his rights, or clarify his right to future benefits under the terms of an employee welfare benefits plan. 29 U.S.C. § 1132(a)(1)(B); *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1095-96 (7th Cir. 1994).

11

The court reviews an ERISA case under a de novo standard, unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility or to construe plan terms. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where the plan documents contain ambiguous language or no language regarding the scope of judicial review, the court reviews de novo the meaning of the ERISA contract and whether the denial of benefits was correct. *Herzberger v. Std. Ins. Co.*, 205 F.3d 327, 330 (7th Cir. 2000). On the other hand, if it is clear that the plan documents confer discretion on a plan administrator to interpret the plan documents or to determine a participant's entitlement to benefits, the court reviews the determination deferentially, setting aside a denial of benefits only if the decision was arbitrary and capricious. *See id.* at 329-31.

The critical question for determining the standard of review "is notice: participants must be able to tell from the plan's language whether the plan is one that reserves discretion for the administrator." *Diaz v. Prudential Ins. Co. of Am.*, 424 F.3d 635, 637 (7th Cir. 2005). "[E]mployees are entitled to know what they're getting into, and so if the employer is going to reserve a broad, unchanneled discretion to deny claims, the employees should be told about this, and told clearly." *Herzberger*, 205 F.3d at 333. The party claiming deferential ERISA review bears the burden of proving the predicate that justifies it. *Sharkey v. Ultramar Energy, Ltd.*, 70 F.3d 226, 230 (2d Cir. 1995).

The *Firestone* court noted that a federal court should not interfere to control trustees "in the exercise of a discretion vested in them by the instrument under which they act," 489 U.S. at 111 (emphasis deleted), suggesting that discretion in a plan applies only to those exercising the discretion given them specifically. The Seventh Circuit has approved an express delegation of discretionary authority to a new plan administrator or a claims

administrator, meaning that the deferential standard of review would apply to the decisions of the delegated entity. *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 811 (7th Cir.), *cert. denied*, 127 S. Ct. 53 (2006). The plan in *Semien* conferred discretion to construe and apply the plan provisions on the plan administrator and the claims administrator. *Id.* at 810. A plan amendment stated that "Administrative Named Fiduciaries" were granted discretion also as required to construe and apply the plan provisions, and the defendant had been named such a fiduciary in an Administrative Services Agreement. *Id.* at 807, 811. The Seventh Circuit found, based on the express delegation of authority in the plan amendment and Administrative Services Agreement, the arbitrary and capricious standard applied to the denials of benefits by the defendants. *Id.* at 811-12.

The Seventh Circuit commented that it was not deciding whether an *implied* delegation of authority would be sufficient to shift discretionary authority to another, and that the matter remained undecided in this circuit. *Id.* at 811. However, several other circuits have held that the exercise of authority by a party not expressly delegated that authority does not receive deferential review.

> [D]eferential review under the "arbitrary and capricious" standard is merited for decisions regarding benefits when they are made in compliance with plan procedures. When an unauthorized body that does not have fiduciary discretion to determine benefits eligibility renders such a decision, however, this deferential review is not warranted.

*Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 597 (6th Cir. 2001). The plan in *Sanford* gave a Board of Administration the discretionary authority to decide benefits eligibility, but the decision to terminate the plaintiff's benefits was made by the employer instead. *Id.* at 596-97. The Sixth Circuit reviewed the denial de novo rather than deferentially.

13

Likewise, in *Sharkey v. Ultramar Energy*, where it was unclear whether the Pension Committee, which had been granted discretion, or the corporation had made the benefits decision, the Second Circuit stated:

> Appellees are correct that the Retirement Plan grants the Pension Committee, the authorized fiduciary, sufficient discretion so that the arbitrary and capricious standard applies in reviewing its decisions. . . . However, this is so only if the Pension Committee, and not some unauthorized party, made the challenged benefit determination. Where an unauthorized party makes the determination, a denial of plan benefits is reviewed under the de novo standard.

70 F.3d 226, 229 (2d Cir. 1995) (citations omitted). The court remanded the case because of the factual issue concerning who made the benefit determination. *Id.*

Similarly, in *Nelson v. EG&G Energy Measurements Group, Inc.*, the Ninth Circuit applied de novo rather than deferential review when a decision was made by a "Pension Administrator" rather than the "Administrative Committee" that had been given authority under the terms of the plan. 37 F.3d 1384, 1388-89 (9th Cir. 1994). The court stated that "because we do not have an interpretation of the Plan by the Administrative Committee, to whom such authority was granted by the Plan, there is no appropriate exercise of discretion to which to defer." *Id.* at 1389.

The First Circuit in *Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, addressed the situation in which the plan administration booklet granted discretion for interpreting plan provisions to named fiduciaries, but the denial of benefits was made by the plan administrator instead. 986 F.2d 580, 584 (1st Cir. 1993). The court pointed to 29 U.S.C. § 1105(c)(1), as indicating that ERISA allows delegation of responsibilities through express procedures provided in a plan and that a delegate must be designated properly to transfer deferential

14

review. *Id.* Next, the court found insufficient evidence that the plan administrator was delegated authority as required.

> Instead, Chase relies on inferences from the circumstances to establish that Smith was the delegate of the Fiduciaries, which we find insufficient to prove delegation of discretionary authority. . . . Because the relevant plan documents did not grant discretionary authority to the Plan Administrator and the Named Fiduciaries did not expressly delegate their discretionary authority to the Plan Administrator, we find that the district court correctly employed the *de novo* standard of review.

*Id.*

On the other hand, the Tenth Circuit has come close to saying what the Simplicity defendants desire regarding the arbitrary and capricious standard of review. *See Geddes v. United Staffing Alliance Employee Med. Plan*, 469 F.3d 919 (10th Cir. 2006), *petition for cert. filed*, No. 06-1458 (May 2, 2007). But the Tenth Circuit was focused on whether discretion to construe plan terms or to determine benefits could be delegated to a nonfiduciary rather than whether the delegation could be implied rather than expressed. *See id.* at 926 ("Once a health plan administrator . . . has been delegated discretionary authority under the terms of the ERISA plan, nothing prevents that administrator from then delegating portions of its discretionary authority to non-fiduciary third parties . . . "). Further, the *Geddes* court observed that the plan administrator had delegated limited authority to the nonfiduciary "according to the terms of the controlling Plan instrument" and that the benefits determination had been made by the nonfiduciary according to the procedures of the plan, which determination the plan administrator then accepted. *Id.* In other words, "discretion was

exercised by some combination of the fiduciary and its agent." *Id.*[1]  Thus, *Geddes* differs from

the present case, in which the issue regarding delegation is not fiduciary versus nonfiduciary

but rather implied versus express.  Also, here the evidence indicates that First Health was not

granted permission to act in accord with plan documents or to exercise discretion in

combination with Simplicity.  Instead First Health  acted on its own outside of its delegated

authority.  Hence, this court finds unpersuasive, and declines to follow it *Geddes* even if it

were read to permit de facto delegations of discretionary authority to trigger arbitrary and

capricious instead of de novo review.

   Simplicity and the Plan also cite to *Briscoe v. Fine*, 444 F.3d 478 (6th Cir. 2006),

for the proposition that the actual, functional activity of an entity determines whether it is  a

fiduciary -, i.e., that even an entity unnamed as a fiduciary in the plan documents can be

considered a fiduciary if its actions warrant.  However, *Briscoe* was concerned with a claim

of breach of fiduciary duties under 29 U.S.C. § 1109; the court did not address the standard

of review for a decision to deny benefits under 29 U.S.C. § 1132.  Whether an entity can be

considered a fiduciary for purposes of assessing a participant's claim that the fiduciary has

breached its duties without express delegation of authority (providing participants with

additional protection) differs from allowing an implied delegation to invoke deferential review

(providing participants with *less* protection).  Further, the statute regarding who may be

considered a fiduciary for liability purposes addresses those exercising discretionary authority

---

[1]In dissent, Senior Circuit Judge William J. Holloway, Jr. argued that these findings of proper designation and joint discretion was not supported by the evidence, suggesting that *Geddes* may have involved a de facto delegation such as the Simplicity defendants argue here.  469 F.3d at 932-35 (Holloway, J., dissenting).  Regardless of whether the majority incorrectly assessed the facts in the *Geddes* case, its stated reliance on proper delegation of authority and combined discretion makes the opinion distinguishable from the present case, even if the facts might be similar.

or discretionary control over the management of an ERISA plan *or* those exercising any authority or control (discretionary or not) over disposition or management of plan assets, and the defendant found to be a fiduciary in *Briscoe* fit the latter standard. *See id.* at 490-92. It exercised control over plan money, but that control did not have to include discretion. The court specifically pointed out this distinction. *Id.* at 491 ("We will presume . . . that Congress's omission of the word 'discretionary' in the second part of the sentence was intentional, and that the threshold for acquiring fiduciary responsibilities is therefore lower for persons or entities responsible for the handling of plan assets than for those who manage the plan."). Therefore, *Briscoe*'s holding does not affect analysis of discretionary functions at all. Finally, the *Briscoe* court in no way suggested that it was retreating from the holding of *Sanford*, issued by the same court just a few years earlier. In short, *Briscoe* is inapposite.

Further, adopting a functional or implied delegation approach in deciding this case would conflict with the Seventh Circuit's direction that notice to participants is key when it comes to delegation of discretionary authority for purposes of deferential review. This is especially true because the plan documents expressly *disclaim* discretionary authority on the part of First Health.

This court is persuaded to follow *Sanford*, *Sharkey*, *Nelson*, and *Rodriguez-Abreu*. In these cases, four circuit courts decided each matter de novo when the decision under review was not an exercise of discretion by the entity on whom discretion was conferred by plan documents or the proper delegate. Although discretion regarding benefits may be conferred by the plan on a certain administrator, such that the administrator's decisions are reviewed deferentially, a decision by an unauthorized party is not entitled to such deference,

Case 2:02-cv-00387-CNC   Filed 09/17/07   Page 17 of 34   Document 87

as discretion has not been exercised appropriately. If the decision is made by an unauthorized entity, de novo review rather than arbitrary and capricious review applies.

In the present case, the Plan named Simplicity as Plan Administrator and gave Simplicity the authority to make rules and regulations necessary for the efficient administration of the Plan; to interpret the Plan; to decide – within its discretion – all questions concerning the Plan and the eligibility of any person to participate in the Plan; to appoint agents to assist in administering the Plan; and to delegate its responsibilities under the Plan, "any such allocation, delegation or designation . . . in writing." (Tr. Ex. 1 at 64.) Therefore, Simplicity was given discretion and the arbitrary and capricious standard should apply to decisions of Simplicity or any entity to which it delegates in writing authority regarding discretionary decisions.

During closing arguments, Simplicity admitted that First Health, not Simplicity, denied all stages of Bowe's or Samaritan's claim. (*Accord* Tr. Ex. 6 (First Health's "final determination" letter).) Yet, the Simplicity defendants have not presented any written evidence that First Health was delegated authority to make final determinations regarding benefits. First Health was a named third-party claims administrator in the Plan and the Plan stated that medical benefits would be "adjudicated" by First Health, in conjunction with Associates for Health Care. (Tr. Ex. 1 at 57, 72.) However, the Plan also stated that the Plan Administrator retained "ultimate authority to interpret plan terms and make determinations regarding eligibility and benefits." (*Id.* at 57.) The MSA provided that First Health was to perform its services "in accordance with the terms of the Plan." (Tr. Ex. 15 MSA ¶ 1.) Further, "FIRST HEALTH is . . . not . . . a fiduciary of the Plan or . . . an employee or agent of [Simplicity]. FIRST HEALTH shall have no final discretionary authority or control over the

18

management or disposition of Plan assets, and no authority over or responsibility for Plan administration." (*Id.* ¶ 3.) Moreover, First Health was to advise the plan administrator, i.e., Simplicity, of all appeals of denied claims for the plan administrator to make the final benefits determinations. (*Id.* Services & Fees Ex. ¶ II.B.7.)

Here, as in *Semien,* there was no express written delegation of discretionary authority over final benefits determinations. Indeed, the Plan and MSA *disclaim* any delegation of discretionary authority for final benefits determinations. Further, the Medical Plan Document requires delegations of authority to be in writing.

In view of *Diaz*, notice to participants is key and de facto authority is insufficient. However, in this case plan participants were not on notice of any discretion on the part of First Health for any final claims determinations. Although as claims administrator First Health made routine benefits determinations, the Plan stated that the Plan Administrator retained ultimate authority to interpret plan terms and make determinations regarding eligibility and benefits. (Tr. Ex. 1 at 57.) Further, the MSA provided that First Health would advise Simplicity of all appeals of denied claims for *Simplicity* to make the final decision, and both Simplicity and First Health acknowledged in the MSA that Simplicity, not First Health, had final discretionary authority over benefits determinations. Consequently, the court will review the denial of benefits under the de novo standard.

IV.  SCOPE OF RECORD – ADDITIONAL EVIDENCE TO BE CONSIDERED

Deferential review of a benefits denial means a review limited to the administrative record before the plan administrator. *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 981-82 (7th Cir. 1999). However, on de

19

novo review, the Seventh Circuit permits the parties to take discovery and present new evidence. *Id.* at 982.

In *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1098-99 (7th Cir. 1994), the Appeals Court discussed a circuit split on the scope of the record when the court reviews a plan administrator's decision de novo. The Seventh Circuit noted (1) the Third Circuit had found the district court could permit further evidence to enable it to exercise its judgment fully; (2) the Sixth Circuit had held the de novo standard did not permit consideration of evidence not before the plan administrator; (3) the Eighth Circuit had held that for good cause the court could permit introduction of evidence not presented to the administrator; (4) and the Fourth Circuit had indicated that the de novo standard allowed additional evidence where necessary for adequate review by the district court. *Id.* at 1098 (citing *Luby v. Teamsters Health, Welfare & Pension Trust Funds*, 944 F.2d 1176 (3d Cir. 1991); *Miller v. Metro.Life Ins. Co.*, 925 F.2d 979 (6th Cir. 1991); *Donatelli v. Home Ins. Co.*, 992 F.2d 763 (8th Cir. 1993); *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017 (4th Cir. 1993)). According to the Seventh Circuit, in light of *Firestone*'s de novo standard, "the district court need not limit the evidence . . . to that which was before the plan administrator." *Id.* at 1099 n.4. Citing the Third, Eighth, and Fourth Circuit cases, the Seventh Circuit added that "[t]his is the emerging rule in several other circuits." *Id.* Focusing on the Fourth Circuit case, the Seventh Circuit said that on remand, because "the record before the plan administrator was relatively undeveloped," and the de novo review standard applied, "the district court may limit the evidence to the record before the plan administrator, or it may permit the introduction of additional evidence necessary to enable it to make an informed and independent judgment." *Id.* at 1099.

In *Casey*, the Seventh Circuit chose not to follow the Sixth Circuit's lead, but rather the Third, Eighth, and Fourth Circuits, which permit the district court to consider evidence beyond the administrative record. Certainly, as the *Casey* court stated, if the administrative record is insufficiently developed, the court may permit additional evidence to make an informed and independent judgment.

Here, the court will permit the additional evidence beyond the administrative record. First, the Simplicity defendants seemed to acknowledge the need for additional evidence by failing to object at trial to the presentation of additional proof. However, inexplicably they raised an objection during closing argument, after the "supplemental" evidence had already been admitted. Second, the Simplicity defendants also presented additional evidence, and in doing so acknowledged the need for further proof. Their expert testified as to his opinion regarding Bowe's need for skilled nursing care, and did not limit his testimony to analysis of the plan administrator's decision and the information solely before the plan administrator. (*See also* Tr. Ex. 19 at 2 ("In my opinion, skilled nursing benefits should have been made available dating from October 27, 1995, through November 7, 1995.").) Third, and importantly, the Simplicity defendants admit that First Health rather than Simplicity denied Bowe's claim and appeals, and acknowledged that they have not established exactly what documents First Health considered as the administrative record. Even so, this court should not accept the administrative record considered by First Health, as it was not properly delegated authority to make the final decision on Bowe's appeals. Moreover, the court is not confident that the administrative record was developed properly, when the administrative decision was made by an unauthorized entity. Fourth, Simplicity argued that documents may have been lost during the five years between the denial of the instant claim and the filing of

21

this case, due to the purchase of First Health by another entity, and termination of First Health as claims administrator. Again, the court cannot be confident about what the administrative record actually is. Fifth and finally, in correspondence from First Health to Samaritan, dated October 24, 1995, First Health stated that one of its case managers would track Bowe's progress "and discuss care options with the attending physician." (Tr. Ex. 2.) Yet Bowe's primary physician testified that he did not recall any contact by First Health to discuss Bowe's medical condition. (Mosley Test.)

Upon this background, the court concludes that the administrative record was insufficiently developed and unreliable. Therefore, the court will consider the additional evidence presented at trial so it can reach an informed de novo judgment on this record.

V. FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING BENEFITS

The plan at issue provides benefits only for covered services and supplies that are "medically necessary" for the treatment of a covered illness or injury. (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 15; Tr. Ex. 1 at 25.) "Medically necessary" and "medical necessity" are defined in the Medical Plan Document as treatment, services or supplies for which all of the following are true:

> (1) they are generally accepted by the national professional medical community as being safe and effective in treating a covered *illness or injury*; and (2) they are consistent with the symptoms or diagnoses; and (3) they are furnished at the most appropriate medical level; and (4) they are not primarily for the convenience of the patient, a *health care provider*, or anyone else; and (5) they are not *experimental/investigative (investigational)*.

> Because a *health care provider* has prescribed, ordered or recommended a service or supply does not, in itself, mean that it is *medically necessary* as defined above.

22

(Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 16; Tr. Ex. 1 at

62.) "Skilled Nursing Facility" care is covered (Tr. Ex. 1 at 28-29) if recommended by a

physician and if such care begins within ten days of a hospital confinement, up to 730 days

per lifetime (with certain reductions) (*id.* at 29). "Skilled Nursing Facility" is defined as a

> public or private facility, licensed and operated according to the
> law, which provides: permanent and full-time facilities for 10 or
> more resident patients; a registered nurse or *physician* on full-
> time duty in charge of patient care; at least one registered nurse
> or licensed practical nurse on duty at all times; a daily medical
> record for each patient; transfer arrangements with a *hospital*;
> and a utilization review plan.
>
> The facility must be primarily engaged in providing
> continuous skilled nursing care for persons during the
> convalescent stage of their *illness* or *injury*, and is not, other than
> by coincidence, a rest home for *custodial care* or for the aged.

(Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 17; Tr. Ex. 1 at

66.) Moreover, "[t]he facility must be primarily engaged in providing continuous skilled nursing

care for persons during the convalescent stage of their *illness* or *injury*, and is not, other than

by coincidence, a rest home for *custodial care* or for the aged." (Joint Final Pretrial Report

Stip. 1; First Health Proposed Findings of Fact ¶ 17; Tr. Ex. 1 at 66.)

However, the plan specifically excludes from coverage, regardless of medical

necessity or recommendation of a health care provider, "custodial care," which is defined as

"services and supplies that are furnished primarily to assist an individual in the activities of

daily living," including "bathing, feeding, administration of oral medicines, or other services

that can be provided by persons without the training of a *health care provider*." (Joint Final

Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 18; Tr. Ex. 1 at 26; *see also*

Tr. Ex. 1 at 37-38, 57.) A health care provider is a physician, practitioner, nurse, hospital or

specialized treatment facility. (Tr. Ex. 1 at 59.) And a "specialized treatment facility" includes skilled nursing facilities, among other facilities. (*Id.* at 66.)

Samaritan asserts that it provided skilled nursing care services to Mary Anne Bowe, a participant of the Plan (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 20), which the Plan should have paid under its terms. On the other hand, Simplicity and the Plan maintain that Samaritan provided custodial care to Bowe, which is not covered by the Plan.

Among other conditions, Bowe suffered from chronic obstructive pulmonary disease with congestive heart failure, vascular disease, seizures, and insulin-dependent diabetes. (Mosley Test.; Tr. Ex. 9 St. Joseph's summary of 10/13/95 admission at 1.) Bowe was admitted in an unresponsive state to St. Joseph's Community Hospital of West Bend on October 13, 1995, due to low blood sugar and seizures. (Mosley Test.; Ex. 9 St. Joseph's summary of 10/13/95 admission at 1.) Bowe was transferred and admitted to Samaritan effective October 23, 1995. (*See* Tr. Ex. 2.) On October 24, 1995, First Health certified that the admission met the plan's definition as "medically necessary." (Tr. Ex. 2.) No evidence suggests that Bowe's care was not covered on October 23, 1995, and the parties seem to agree that on that date her care was covered. Thus, the court finds that on October 23, 1995, Bowe's stay at Samaritan was medically necessary and did not constitute custodial care. However, Bowe was notified that the certification could be terminated, as First Health would review in the future whether the treatment continued to be medically necessary. (*Id.*) First Health stopped paying for Bowe's care at Samaritan as of approximately November 11 or 20, 1995. (Joint Final Pretrial Report Stip. 1; First Health Proposed Findings of Fact ¶ 22 (stating 11/11/95); Tr. Ex. 18 First Health EOB dated 12/27/95 (stating 11/20/95).) As Samaritan asks

24

for reimbursement for care through May 3, 1997 (Tr. Ex. 10), the question for the court is narrowed to whether Bowe's care during the period from November 11 or 20, 1995, through May 3, 1997, was medically necessary care in a skilled nursing facility or uncovered custodial care.

Even under the de novo standard of review, the court finds that Bowe's care during this period was "custodial care" as defined in the Medical Plan Document. While the court is convinced that Bowe's care at Samaritan was a better course for her than discharge, the court is not persuaded that the Plan provided coverage for such care.

It is clear that Bowe's doctors recommended that she stay at Samaritan. The record includes references to Bowe's personal wish to be discharged (Tr. Ex. 9 Samaritan progress note entries 12/7/95, 12/8/95, Mosley progress note 2/22/96, West Bend note 4/3/96), and that any such discharge would have been against her doctor's advice (Tr. Ex. 9 Samaritan progress note entry 12/8/95, Mosley progress note 2/22/96, West Bend notes 4/3/96, 4/25/96; Mosley Test.). But as stated in the Medical Plan Document, a health care provider's prescription or recommendation of a service does not mean it is "medically necessary" as defined in the Medical Plan Document. (*See* Tr. Ex. 1 at 62.)

Further, there appears to be no dispute that Samaritan is a "skilled nursing facility" as defined in the Medical Plan Document. The Simplicity defendants admitted as much when they paid for Bowe's care from October 23 through November 11 or 20, 1995, and they do not argue to the contrary before this court. Instead, the Simplicity defendants focus on the level and substance of care provided by Samaritan and its staff to Bowe.

Based on the record in this case, the court finds that the care provided to Bowe was furnished "primarily to assist her in the activities of daily living," such as assisting her with

Case 2:02-cv-00387-CNC   Filed 09/17/07   Page 25 of 34   Document 87

"feeding, administration of oral medicines, or other services that can be provided by persons without the training of a *health care provider*." (*See* Tr. Ex. 1 at 26, 57.) Several services did require medical knowledge or the skill of a health care provider such as a nurse. But a key word is "primarily." Here, Bowe received *primarily* monitoring of her diet, fluid intake, smoking, and the administration of her medications, assistance which could have been offered by a person lacking the training of a health care provider.

Bowe's discharge summaries from St. Joseph's Community Hospital of West Bend and the notes from the West Bend Clinic indicate that Bowe took numerous medications at different times of the day. One of the medications was insulin, to be injected twice-daily. (*See, e.g.*, Ex. 9 St. Joseph's summary of 10/13/95 admission at 2; West Bend Clinic note 1/17/96.) As Dr. Mosley testified, several of the other medications had "narrow windows," meaning they had to be taken in the right dosages and at the right times to be effective. (Mosley Test.) Dr. Mosley stressed that Bowe was not capable of self-administering her medications, due to her mental functioning (she may have suffered a stroke), addictive behavior (nicotine addiction), and general noncompliance. (*Id.*) Although some of the Samaritan progress notes indicate she self-injected insulin on one or two occasions (*see, e.g.*, Tr. Ex. 9 progress note entry 11/19/95, 11/21/95), Dr. Mosley explained that these instances were likely under a nurse's supervision and that based on his knowledge of Bowe, Bowe could not inject her insulin or take her pills on a continuous, ongoing basis. (Mosley Test.) In addition, some of her medications were narcotics, which could be addictive. Dr. Herdrich, medical director of Samaritan, testified, and Samaritan's records indicate, that Bowe's daughter was similarly noncompliant and could not be relied on to provide Bowe with the right medications at the right times. (*See, e.g.*, Herdrich Test.)

26

The court does not doubt that Bowe was incapable of self-administering her medications. The record shows a noncompliant, difficult patient, who exhibited addictive behavior regarding smoking and who ignored the Samaritan staff's reminders about fluid intake and diet, often drinking juice against orders and even drinking a "Pepsi big slam" at the facility at one point. (Tr. Ex. 9 Samaritan progress note 12/17/95.) The court also finds it likely that Bowe's daughter could not or would not properly organize and administer Bowe's medications, as she assisted her mother's noncompliance with orders. (*See, e.g.*, Tr. 9 progress note entry 10/29/95 (daughter brought Bowe a Hardee's burger and vanilla shake and gave Bowe a large cup of ice chips), entry 10/31/95 (Bowe smoking cigarettes provided by family).)

Nevertheless, the standard under the Medical Plan Document regarding custodial care is not whether the particular patient or one of her family members is capable of administering medications, but whether an objective person without medical training could. Here, the court has not been persuaded that anyone more than a personal care assistant or other competent non-medical person was required to assist Bowe with her medications. Notwithstanding the number of oral medications Bowe took and the narrow windows for administering them, the record does not establish that a nurse, doctor or other health care provider was required to administer them. Nor does the record establish that a nurse, doctor, or other health care provider was required to inject Bowe's insulin.

Although a First Health "appeals specialist" apparently thought that Bowe's care could be managed with a "home health nurse administering the insulin shots" (Tr. Ex. 4), the court has no reliable basis for making a finding that a nurse was required. Dr. Mosley admitted that a non-medical person could indeed inject insulin, and the occasional self-

27

injections by Bowe support the court's belief that, in general, diabetic persons, and thus non-health care providers, are able to inject insulin. Defense witness Dr. Bruce Herman added that most of his diabetic patients self-administer insulin. Also, he testified that many patients self-administer their nebulizer treatments. Thus, the administration of medications in Bowe's case was custodial care.

Next, the progress notes from Samaritan are replete with examples of Samaritan staff recording Bowe's noncompliance with her doctor's orders or recommendations of continuous oxygen use, leg elevation, limited fluid intake (*see, e.g.*, Tr. Ex. 9 entries of 12/11/95, 12/12/95, 12/13/95, 12/17/95, 12/22/95, and *passim*), as well as smoking cessation (*id.*, *passim*). Such references to noncompliance constitute a *substantial* portion of the progress notes. Yet, Samaritan has provided insufficient evidence that a health care provider's training was required to monitor these activities. In the court's view, a person without a health care provider's medical training could have monitored Bowe as to these matters.

The evidence indicates that Bowe suffered from boils or sores. Again, Samaritan has not persuaded the court that a health care provider was required on a day-to-day basis to treat this condition. The progress notes show dressings were applied and that Bowe's daughter supplied topical dressing from home for use by Samaritan. (Tr. Ex. 9 progress note entry 11/7/95, 11/8/95.) Further, Dr. Mosley admitted that a lay person could put salves on such boils. (Mosley Test.) Dr. Herman acknowledged that in general a nurse might have to evaluate boils or abscesses to determine whether a salve should be applied, versus a warm soak or lancing. (Herman Test.) But Dr. Mosley also testified that although the boils were a chronic condition, the need for salves was not the reason Bowe was at

28

Samaritan – other conditions were the cause.  Thus the care rendered for Bowe's boils is found to have been custodial, and the frequency of such care is small compared with the monitoring of Bowe's diet, fluid intake, oxygen use, and smoking.

Dr. Mosley mentioned that Bowe's medications had to be adjusted often.  He stated that because of drug interactions and the narrow windows for certain dosages at certain times, monitoring Bowe was a "24/7 situation" and the adjusting of her medications was "dynamic."  (Mosley Test.)  Also, he testified that Bowe was on five or six medications that could result in death if not monitored.  (*Id.*)  Yet the court is unpersuaded that Bowe's care at Samaritan consisted of medical monitoring that took more time than the care Bowe was given for daily living activities.  Lab work was ordered approximately monthly unless it came back as abnormal.  (Mosley Test.; *see also* Tr. Ex. 9 Samaritan progress note entries 11/22/95, 12/21/95, 1/11/96, 1/25/96, 1/26/96 (abnormal results), 2/1/96, 2/12/96, 3/21/96, 4/11/96; Tr. Ex. 16 Samaritan Physician's Orders signed 4/25/96 (ordering monthly and yearly lab work).)    Such blood work, according to Dr. Mosley, could have been done on an outpatient basis, although he thought that Bowe's past noncompliant conduct supported inpatient testing.  (Mosley Test.)  Medical staff monitored Bowe's weight, blood pressure, the edema in her legs and feet, and her blood sugar levels.  (*See, e.g.*, Tr. Ex. 9 St. Joseph's summary of 10/13/95 admission at 2 (indicating weight was to be taken and recorded weekly), Samaritan progress notes entries 11/8/95, 12/6/95, West Bend Clinic notes 2/8/96 (to be weighed daily).)  Regardless, the court is not satisfied that inpatient care was necessary for such monitoring, or that monitoring of weight required a health care provider.  As Dr. Herman testified, checks on medical-related issues could be done by a nurse or physician at an office visit.  In looking at the care provided to Bowe for medical monitoring and the care provided

29

to Bowe for activities of daily living, the medical monitoring is far less than the monitoring of diet, fluids, smoking, oxygen use, and leg elevation.

Further, Dr. Mosley admitted that there are custodial care facilities that can handle some of the care that Bowe received, although some of the facilities required the patient to administer her own medications. One implication, is that there are facilities, at a lower level of care than Samaritan, which could have attended to all or most of Bowe's needs. Dr. Mosley stated that he could not remember what other facilities were available to Bowe, and acknowledged that part of the decision to send a patient to a facility may involve whether care will be the availability of insurance or a plan. (Mosley Test.) As a consequence of this evidence, Samaritan has failed to persuade the court that a lower-level care facility would have been unable to attend to Bowe's needs.

In a letter dated December 10, 2002, Bowe's doctor admitted that Bowe

was extremely limited in her functional status [and] led a bed-to-wheelchair-to-chair existence. She required assistance in terms of setting up and administration of medications, activities of daily living including bathing, periodic changing of a permanent Foley catheter, dietary restrictions in the form of both fluid and caloric restrictions, discouragement in the use of nicotine products, regular fingerstick blood sugars, administration of insulin for diabetic control, and close monitoring of the patient's weights with adjustment of diuretic use.

(Ex. 11 at 1.) In the letter, Dr. Mosley also discussed Bowe's "polypharmacy" needs, chronic venous insufficiency and peripheral vascular disease, "which required skilled nursing . . . to . . . monitor and actively treat these." (*Id.*) But as even Dr. Mosley acknowledges, much of Bowe's care was focused on activities of daily living.

According to Dr. Herdrich, each separate thing Bowe required may not have required skilled nursing, but when all of her problems were combined she did need it,

especially because one problem or its medications could mask or cause other problems. (Herdrich Test.) Dr. Mosley stated that in his view at some point the activities of daily living become medical necessities, as in Bowe's case. (Mosley Test.) Unfortunately for Samaritan, while the court believes that these doctors cared for Bowe in a responsible manner and Bowe benefitted from being at Samaritan, that does not mean that the Plan covered the costs of such care. The Plan excluded custodial care, defined as services furnished primarily for activities of daily living. On the record before the court, the court finds that the services provided by Samaritan to Bowe were *primarily* for activities of daily living were not covered by the Plan.

Samaritan's final argument is that First Health, and thus the Plan, violated 29 U.S.C. § 1133[2] by not providing Bowe with an initial denial letter in writing[3] and by failing to include in its later written denials of benefits sufficient discussion of the reasons her benefits were being terminated. (Pl.'s Br. in Supp. of its Claim for Denied Benefits (doc. #60) at 11-13.) Samaritan cites to *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685 (7th Cir. 1992), for support.

---

[2]Section 1133 provides that an employee benefit plan must

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

[3]Actually, a written explanation of benefits denying payment after "professional review" does appear to have issued, although it is unclear whether it went to Bowe or Samaritan. (Tr. Ex. 18 EOB dated 12/27/95.) The court makes no finding as to whether this EOB satisfied ERISA procedural requirements.

In *Halpin*, the Seventh Circuit found that in terminating permanent disability payments that had previously been awarded, a plan administrator had failed to meet the requirements of § 1133. *Id.* at 691-97. Denial letters did not give the claimant required information about the reasons for denial such that his appeal process was flawed and he did not receive a full and fair review. *Id.* The court approved as a remedy the vacating of the termination of disability benefits and an order that the benefits be reinstated. *Id.* at 697. However, the courts in *Halpin* reviewed the termination of benefits under the arbitrary and capricious standard, *id.* at 688, and, as a result, the flaws in the denial and appeal process, affected the decision to which the court was supposed to defer.

But that is not the case here, where the court reviewed the termination of benefits de novo and permitted supplementation of the record. In *Fischman v. Blue Cross & Blue Shield of Connecticut, Inc.*, 775 F. Supp. 513, 517 (D. Conn. 1991), the district court indicated that where the denial of coverage is not discretionary and subject to de novo review by the court, no substantive remedy to redress a procedural violation is necessary because no discretion has been abused. Put another way, de novo review by the court remedies the procedural flaw. *See id.*

Just recently, Chief Judge Rudolph T. Randa of this district concurred. In a case in which he reviewed the denial of benefits de novo, Judge Randa found that even if procedural violations occurred, the plaintiff's relief would be procedural rather than substantive, and the plaintiff was "foreclosed from obtaining such relief by virtue of the Court's *de novo* determination that UNUM's denial of benefits was correct." *Lehman v. UNUM Life Ins. Co. of Am.*, No. 03-C-234, 2006 WL 2792852, *11 (E.D. Wis. Sept. 26, 2006).

32

Thus, a violation of the procedural rules of § 1133 does not necessarily entitle Samaritan to a substantive award of benefits. *Engler v. Cendant Corp.*, 434 F. Supp. 2d 119, 129 (E.D.N.Y. 2006); *Borowski v. Int'l Bus. Machs. Corp.,* 978 F. Supp. 550, 557 (D. Vt. 1997), *aff'd*, 165 F.3d 13 (2d Cir. 1998). In *Fischman*, *Lehman*, *Engler*, and *Borowski*, the courts noted the absence of authority for a substantive award of benefits as a remedy for procedural violations where the ultimate decision was correct. *Lehman*, 2006 WL 2792852 at *11; *Engler*, 434 F. Supp. 2d at 129; *Borowski*, 978 F. Supp. at 557; *Fischman*, 775 F. Supp. at 517.

Here, the court's de novo review, and consideration of Samaritan's supplemental evidence, remedied any procedural violation. Moreover, the ultimate decision to terminate benefits was correct. Therefore, the procedural violation cannot result in the substantive award of benefits.

## VI. ATTORNEYS' FEES

In their proposed conclusions of law, the Simplicity defendants suggest that if they win, the court should award them reasonable attorneys' fees due to "[t]he combination of Plaintiffs' [sic] delay in bringing this action and its insistence on seeking recovery of benefits which [are] not authorized or due under the Simplicity Health Care Plan." (Defs.' Proposed Findings of Fact and Conclusions of Law at 13.) Pursuant to 29 U.S.C. § 1132(g), "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."

The court declines the request. This case was not barred by laches, so the delay noted by the Simplicity defendants in filing this action is an insufficient basis for awarding fees. Importantly, the court has found that for purposes of this portion of the case an unauthorized party, First Health, made the final claims decision when that decision should

33

have been made by Simplicity, triggering de novo rather than arbitrary and capricious review. Under the de novo standard, the final findings in this case were close, and the judgment in favor of defendants was not clear cut. For these reasons, fee shifting is not warranted.

## VII.  CONCLUSION

For the foregoing reasons, Samaritan loses on its claim for benefits under the Plan, the plaintiff takes nothing and Samaritan's case shall be dismissed. As a result, the third-party claims shall be dismissed as moot.

Dated at Milwaukee, Wisconsin, this 17th day of September, 2007.

BY THE COURT


s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. District Judge